**CITIES SERVICE COMPANY, Petitioner,**
and
**Arkansas Fuel Oil Corporation, Intervening Petitioner,**
v.
**SECURITIES AND EXCHANGE COMMISSION, Respondent,**
and
**The Pennroad Corporation, Louis E. Marron, James W. Hearn, et al., Intervening Respondents.**

No. 268, Docket 24371.

United States Court of Appeals
Second Circuit.

Argued April 2, 1957.

Decided July 15, 1957.

648

Cravath, Swaine & Moore, New York City (Bruce Bromley, Richard deY. Manning, and John D. Calhoun, of counsel), and Joseph L. Weiner, New York City, for Cities Service Co., petitioner.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City (S. Hazard Gillespie, Jr., New York City, H. C. Walker, Jr., Shreveport, La., and Parker Bailey and Robert B. Fiske, Jr., New York City, of counsel), for Arkansas Fuel Oil Corp., intervening petitioner.

Thomas G. Meeker, Gen. Counsel, Joseph B. Levin, Asst. Gen. Counsel, Solomon Freedman, Asst. Director, Division of Corporate Regulation, Stuart C. Law and Louis E. Clevenger, Washington, D. C., for Securities and Exchange Commission, respondent.

Percival E. Jackson, New York City, for the Pennroad Corp. and Louis E. Marron, intervening respondents.

Burns, Currie, Rich, Maloney & Rice, New York City, and Burns, Blake & Rich, Boston, Mass. (John J. Burns, Harold B. Dondis and Walter L. Landergan, Jr., Boston, Mass., of counsel), for James W. Hearn and others, intervening respondents.

Henry A. Bergstrom and Weller, Wicks & Wallace, Pittsburgh, Pa., for M. L. Benedum, amici curiae.

Before CLARK, Chief Judge, LUMBARD, Circuit Judge, and LEIBELL, District Judge.

LUMBARD, Circuit Judge.

The basic issue in this case is whether Cities Service Company and its subsidiaries can be denied exemption from registration under the Public Utility Holding Company Act, 15 U.S.C.A. § 79, because of a publicly-held minority interest in one of Cities Service's subsidiaries, Arkansas Fuel Oil Corporation ("Fuel Oil"), even though Cities Service and all its subsidiaries have disposed of all their utility holdings. The denial was based, in part, on a prior proceeding involving Fuel Oil in which jurisdiction was specifically retained over that company as a "registered holding company," because of the publicly-held minority interest. We hold that the order of the Securities and Exchange Commission is correct in law, and supported by substantial evidence.

In 1941 Cities Service registered under the Act as a holding company within the meaning of § 2(a)(7) of the Act, 15 U.S.C.A. § 79b(a)(7)—a company which directly or indirectly owns or controls 10% or more of the voting securities of a public utility company. At the time it controlled more than 125 companies, both utility and non-utility. One of its subsidiaries was Arkansas Natural Gas Corporation ("Arknat"), the predecessor of Fuel Oil, which was itself a registered holding company with two subsidiaries—one a gas utility company, and the other a non-utility. In 1944 the Securities and Exchange Commission ordered Cities Service to limit its operations to those of a single integrated gas utility system under § 11(b)(1) of the Act, 15 U.S.C.A. § 79k(b)(1), and at Cities' request, it allowed Cities the

alternative of disposing of all its utility interests and to remain purely an oil company retaining the rest of its system intact. 17 S.E.C. 5 (1944). Cities chose the latter course. This required Cities' subsidiary, Arknat, to dispose of its interest in its gas utility subsidiary.

In 1951 Arknat filed, and the Commission approved, a reorganization plan which was designed to eliminate its utility interest, thereby terminating Arknat's holding company status, and to clear up voting and other inequities, pursuant to § 11(b)(2) of the Act.[1] As a result, Arknat gave up its interest in its utility subsidiary and merged with its oil subsidiary, the Arkansas Fuel Oil Corporation (Fuel Oil). This left a publicly-held minority interest in Fuel Oil[2] and the Commission noted that this raised problems, the solution of which would however be postponed. In its discussion of whether the plan was "necessary to effectuate the provisions of § 11(b)(2) of the Act, the Commission stated:

"We recognize that the continued existence of a minority interest in Fuel Oil presents a problem which may require corrective action. However, in view of the fact that *Fuel Oil will remain under our jurisdiction as long as Cities is a registered holding company (a status which will continue until terminated by us)*, we believe that consideration of this problem may be deferred until a later date.

"In the interim, provision should be made to give the public minority

stockholders adequate representation on the initial board of directors of Fuel Oil, and accordingly prior to consummation of the plan Arknat should submit to us the names of the proposed directors for such action as we may deem proper.

"In view of the foregoing, we find, that *subject to the reservations noted*, the plan provides an appropriate means for achieving the results required by Section 11(b)." [Emphasis added.] Holding Company Act Release No. 11511 (1952).

In its order of October 1, 1952, approving the plan the Commission expressly stated:

"Jurisdiction * * * is further specifically reserved with respect to * * * c. The resolution of the problems presented by the continued existence of a minority public interest in Fuel Oil after consummation of the plan; * * *"

In 1953 Fuel Oil applied to the Commission under § 5(d) of the Act, 15 U. S.C.A. § 79e(d), for an order declaring that Fuel Oil was no longer a holding company. The Commission granted the order on October 7, 1953, but subject to the original reservation of jurisdiction for purposes of dealing with the minority interest problem. The order stated:

"In requesting the entry of an order, pursuant to Section 5(d) of the Act, declaring that it has ceased to be a holding company *Ark-Fuel has agreed and consented that any such order shall be without prejudice*

1. Section 11(b) (2) of the Act provides, in part:
"It shall be the duty of the Commission, as soon as practicable after January 1, 1938: * * *
"(2) To require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall take such steps as the Commission shall find necessary to ensure that the corporate structure or continued existence of any company in the holding-company system does not unduly or unnecessarily complicate the structure, or unfairly or inequitably distribute voting power

among security holders, of such holding-company system. * * * Except for the purpose of fairly and equitably distributing voting power among the security holders of such company, nothing in this paragraph shall authorize the Commission to require any change in the corporate structure or existence of any company which is not a holding company. * * *"

2. Cities Service received 51.5% of the stock and the other shareholders received the other 48.5%. As of December 3, 1954 there were 20,552 shareholders in Fuel Oil.

*to the jurisdiction reserved by the Commission's order dated October 1, 1952 \* \* \* to the extent that the matters specified therein have not theretofore been disposed of.*

\* \* \* \* \* \*

"The Commission finds that Ark-Fuel has ceased to be a holding company, *that it is necessary for the protection of investors that the Commission retain jurisdiction over Ark-Fuel to the same extent as though it were still in all respects a registered holding company in respect of the matters over which jurisdiction was reserved in the Commission's Order dated October 1, 1952 \* \* \** to the extent that the matters specified therein have not heretofore been disposed of, and that *except for such retained jurisdiction,* the registration of Ark-Fuel as a holding company should cease to be in effect." [Emphasis added.]

By 1955 Cities had disposed of all its utility holdings with one exception not relevant here. On January 29, 1955 Cities applied for exemption for itself and each of its subsidiaries from the provisions of the Act under § 3(a)(5) which provides:

"(a) The Commission \* \* \* shall exempt any holding company, and every subsidiary company thereof as such, from any provision or provisions of this title, unless and except insofar as it finds the exemption detrimental to the public interest or the interest of investors or consumers, if—

\* \* \* \* \* \*

"(5) such holding company is not, and derives no material part of its income, directly or indirectly, from any one or more subsidiary companies which are, a company or companies the principal business of which within the United States is that of a public-utility company."

In its application, Cities stated that upon grant of the exemption, the reservation of jurisdiction over Fuel Oil would become moot. The Commission decided that the exemption application and the problem for which jurisdiction over Fuel Oil was retained involved common issues of fact and law and dealt with them together.

Cities argued before the Commission, and here, that, since it no longer had any utility interest, any violations of § 11(b) (2) which might be charged against Fuel Oil and therefore against Cities were immaterial; that neither it nor Fuel Oil was any longer a "holding company" within the meaning of the Act and hence the two companies were no longer within the Commission's jurisdiction. The Commission on the other hand held that, regardless of whether Cities and Fuel Oil still had utility interests, both remained subject to the Act and to the jurisdiction of the Commission because Cities' registration had never been terminated and the termination order as to Fuel Oil specifically reserved jurisdiction over it as a registered holding company for the purpose of dealing with the problem of the minority interest. The Commission held that § 11(b) (2) was therefore applicable to Fuel Oil and was relevant to consideration of Cities' application under the "unless and except" clause of § 3(a) (5).

The Commission then analyzed the relationships between Fuel Oil and the rest of the Cities system. It concluded that the existence of a publicly-held minority interest in Fuel Oil constituted a complexity and produced an inequitable distribution of voting power, which violated § 11(b) (2) and prevented an exemption for Cities under the "unless and except" clause of § 3(a) (5). According to the Commission, this could be cured only by eliminating the minority interest from the system, which could be achieved by either (1) eliminating the minority interest in Fuel Oil, or (2) Cities disposing of its interest in Fuel Oil. The exemption was therefore denied. This decision Cities and Fuel Oil seek to have reviewed on their petition to this Court.

We are confronted with two basic issues: (1) whether Cities and Fuel Oil are still subject to the Holding Company

Act; (2) if they are, whether the elimination of the minority interest is required by § 11(b) (2) or any other provision of the Act.

### 1. Jurisdiction over Cities and Fuel Oil.

Jurisdiction over Cities and Fuel Oil turns on the resolution of two issues: (a) Is an exemption for Cities and its whole system required by the language of the Act, its policy, or by the Commission's decision of 1944; (b) if not required by any of these, do the reservation of jurisdiction over Fuel Oil and Cities' prior registration provide sufficient jurisdictional support, either separately or together, for the Commission's action.

### a. Automatic exemption for Cities Service.

Cities contends that by disposing of all its utility holdings, it and its whole system automatically became entitled to exemption under § 3(a) (5), implying that compliance with the formal requirements of that section is sufficient. In support of this, Cities argues that the Commission decision approving its reorganization plan in 1944 provided that upon disposition of the utility interests Cities could "retain the rest of its system intact," 15 S.E.C. 962, 978, 17 S.E.C. 5, 6 (1944) [Emphasis by Cities], and it reads this to mean free from any other regulation. This reading of the decision is alleged to be in accord with statutory policy, for, it is argued, the Act was not intended to regulate companies after they had disposed of their utility interests. Thus, § 11(b) (2) applies only to companies "which are to remain in a public utility holding company system as permitted by Section 11(b) (1)."

Cities' argument both misreads the act and misconstrues the 1944 Commission decision. We think that the Commission was empowered to require action in addition to disposition of all utility interests and subsequent thereto, and that its decision in 1944 was not intended to curtail these powers. We will first discuss the statute and its policy.

The language of § 3(a) (5) itself indicates that even after a system has eliminated all its domestic utility interests, regulation may continue. Thus it provides that even though "such holding company is not, and derives no material part of its income, directly or indirectly, from any one or more subsidiary companies which are, a company or companies the principal business of which within the United States is that of a public-utility company," the Commission may still deny an exemption if it finds "the exemption detrimental to the public interest or the interest of investors or consumers." This clause clearly implies that regulation of registered holding company systems may go beyond requiring elimination of the utility interests at both the initial and later stages of regulation. See also, In re United Corporation, 3 Cir., 232 F.2d 601, certiorari denied, 1956, 352 U.S. 839, 77 S.Ct. 59, 1 L.Ed.2d 56.

The policy underlying this is equally clear, and is not as limited as Cities contends, "Although one of the purposes of the Act was the elimination of holding companies, another purpose was the elimination of evils which had become part of the corporate structure of registered holding companies and their subsidiaries * * *" In re United Corporation, 232 F.2d at page 606. This policy would be frustrated if companies which were required to register and to be subject to Commission regulation, were to be released from such regulation before the various evils were rectified.

Nor does anything in the legislative history support Cities' contention. Although it is true that much of it is couched in terms of regulation of public utilities, and of eliminating the evils in such systems, the crucial question before us is whether regulation by the Commission must stop at requiring elimination of the utility interests. As to this, whatever legislative history there is, is to the contrary. Thus, the Report of the National Public Power Policy Committee stated: "Such legislation should eradicate disclosed abuses, * * * and make possible the elimination of the holding company where it serves no demonstrably

useful or necessary purpose." H.R.Rep. No. 137, 74th Cong. 1st Sess. 8(1935) [Emphasis added].[3]

That the utility interests are disposed of before all the abuses have been eliminated does not deprive the Commission of power to deal with the abuses even though it chooses to do so after the divestiture. We therefore hold that once a company registers under the Act as did Cities Service, the Commission may take all necessary and proper steps to "eradicate disclosed abuses" in addition to elimination of utility interests leading to eventual exemption.

■ In light of this discussion of the statute and its policy, Cities' construction of the 1944 decision is not persuasive. Moreover, that decision dealt exclusively with Cities' compliance with § 11(b) (1), which relates to geographical integration. By allowing the rest of the system to remain "intact," the Commission meant only that if Cities were to dispose of all its gas distribution properties, it could retain all its other businesses.[4] Problems related to § 11(b) (2) were not even remotely involved.

We therefore hold that neither compliance with the formal requirements of § 3(a) (5), nor the Commission's decision in 1944 requires exemption for Cities and its system.

b. *Jurisdictional support for the Commission's action.*

■ Cities and Fuel Oil contend, however, that even if the Cities system is not entitled to exemption by meeting the formal requirements of § 3(a) (5), the 1952 plan which resulted in Fuel Oil was intended to meet all the requirements of § 11(b) (2) and that the 1953 order terminating Fuel Oil's status as a holding company confirmed this. Hence, the Commission could not require elimination of the minority interest in order to satisfy § 11(b) (2).[5]

We reject the petitioners' contention that the plan approved in 1952 was intended to constitute full compliance with all the requirements of § 11(b) (2). The Commission's language approving the plan, supra, 247 F.2d 649 shows that it considered that more still needed to be done and that, as it said, "consideration of this problem [the continued existence of a minority interest] may be deferred until a later date." The reservation of jurisdiction in the opinion and order was intended for the specific purpose of dealing with the problem of the minority interest at a later time.

Cities and Fuel Oil claim, however, that this retention of jurisdiction is not broad enough to support the Commission's action in this case. They first point out that the various orders retained jurisdiction over Fuel Oil only as a "registered holding company," and not as a "holding company." The difference is that a "holding company" is a company which owns 10% or more of a public utility company[6] whereas a "registered

3. Indeed, the abuses within the Cities system were among the main causes for the passage of the Holding Company Act. See Cities Service Company, 8 S.E.C. 318, 335-37, 340-359 (1940).

4. " * * * our order does not foreclose retention in the Cities Service system of all of its oil business, all of its gas production and transmission business, and all of its other nonutility holdings, if Cities should choose to comply with Section 11(b) (1) by disposing of its holdings in all utility companies. In designating the Mid-Continent [gas] distribution properties as the single retainable system we do not require retention of this system. Cities may choose to dispose of its utility holdings and retain the rest of the system intact." 15 S.E.C. 962, 978 (1944).

5. Because the Commission did not rely solely on § 11(b) (2) but also on the "unless and except" clause entirely apart from the requirements of § 11(b) (2), see p. 1919, n. 9, infra, the appellants also argue that the "unless and except" clause alone is insufficient authority for requiring the elimination of the minority interest. Since we agree with the Commission that § 11(b) (2) is applicable, we need not discuss that contention.

6. Sec. 2(a) (7), 15 U.S.C.A. § 796b(a) (7) provides: " 'Holding company' means— (A) any company which directly or in-

holding company" is merely "a person whose registration is in effect under section 5," 15 U.S.C.A. § 79b(a) (12) and need not be a holding company, i. e., with utility interests. And since the plan had required Fuel Oil's predecessor to dispose of all its utility holdings, Fuel Oil was in fact no longer a holding company. They then point out that the third sentence of § 11(b) (2)[7] prohibits the Commission from authorizing any change in the capital structure of any company not a holding company except for the purpose of correcting an inequitable distribution of voting power,[8] and they wind up their argument with the charge that the Commission erred in holding that the mere continued existence of a publicly-held minority interest could produce an inequitable distribution of voting power. They conclude that the Commission's order was outside the exception specified in the third sentence of § 11(b) (2). We find it unnecessary to pass on the soundness of petitioners' proposed distinction between a "holding company" and a "registered holding company." Petitioners' argument concedes that if the Commission's action was in order to eliminate an inequitable distribution of voting power, its action was within its jurisdiction regardless of which status Fuel Oil retained. We therefore turn to the Commission's decision that the publicly-held minority interest produced such an inequitable distribution.[9]

c. *The meaning of "inequitably distributed voting power."*

■ Cities and Fuel Oil contend that an inequitable distribution must exist "in the particular company"—here, Fuel Oil—and not in the system as a whole. Since each shareholder in Fuel Oil has one vote for one share, they claim that the distribution cannot be inequitable within the company.

We do not agree that the one vote-one share formula precludes a finding that there is an inequitable distribution of voting power. In the first place, although the statute may refer only to an equitable distribution "in the particular company in question," it does not follow that "the Commission * * * may not correct an unfair and inequitable distribution of voting power existing *by reason of* such company's inclusion in a holding company system."[10] [Emphasis added.] The statute is concerned with an undesirable effect, regardless of its cause, and petitioners' reasoning confuses cause and effect.

As to whether there was an inequitable distribution in Fuel Oil despite the one share-one vote proportion, we think that petitioners' conception of what is equitable and fair is unrealistic. A ballot has power only when it can influence decision. Because of the majority rule principle, the voting power of a permanent minority can easily be annulled. One reason why the minority is willing to run this risk is the belief that by and large, differences between majority and minority are differences over means rather than ends since the majority is as eager

7. "Except for the purpose of fairly and equitably distributing voting power among the security holders of such company, nothing in this paragraph shall authorize the Commission to require any change in the corporate structure or existence of any company which is not a holding company. * ♦ * "

8. If the company is a holding company, the Commission may require the elimination of complexities as well as the correction of inequitable distributions of voting power.

directly owns, controls, or holds with power to vote, 10 per centum or more of the outstanding voting securities of a public-utility company or of a company which is a holding company. * * * "

9. The Commission based its decision on two other grounds as well: (1) that the existence of the minority interest constituted a complexity within the meaning of § 11(b) (2); (2) that the existence of a conflict in interest between a registered holding company and its subsidiary justified denial of the exemption under the "unless and except" clause of § 3(a) (5) entirely apart from the requirements of § 11(b) (2). Since, as will appear, we agree with the Commission that there is an inequitable distribution of voting power, we need not discuss the other two grounds.

10. Reply Brief for Petitioner Cities Service p. 6.

to further the interests of the corporation as the minority. Thus, if a minority shareholder can convince the majority that a certain course is best for the corporation, he expects that the majority will concur therein, for he expects that it will consider the common corporate interest to be of paramount importance. If the majority's basic concern is not for the welfare of the particular corporation but for an interest which may be adverse, there is no common interest and the minority is effectively disenfranchised—its votes are meaningless and it is at the mercy of the majority.

Thus even within the individual company itself—Fuel Oil—if the minority has no chance to influence decision because the majority does not have single-minded allegiance to the corporation, the one share-one vote formula does not mean that the distribution of voting power is equitable. We thus come to the question of whether there is support for the Commission's finding that there is an "inherent conflict of interests which pervades all aspects of dealings between the Fuel Oil system and the Cities system * * * [and which] constitutes a detriment to the interests of the minority stockholders, who are thereby deprived [of] a management conducting Fuel Oil's affairs with an eye single to its own advantage."

2. *The conflict of interest.*

■ It is not necessary to set forth the details of the arrangement between Fuel Oil and the rest of the Cities Service system, which appear in the Commission's decision. Briefly, Fuel Oil's predecessor owned and operated a refinery at Bossier City, Louisiana. By 1938 the refinery was becoming obsolete and discussions about replacement were begun. Finally in August 1945 an engineering firm submitted numerous plans for modernization.

Despite these plans, on September 20, 1945 Fuel Oil's board of directors voted to shut down the Bossier City refinery and to contract with Cities Refining Co., another Cities Service subsidiary, for Fuel Oil's refined products requirements.

It appears that at this time Cities Refining Co. was in need of markets. The Commission found that this was indeed part of the motive for shutting down the Bossier City plant. Fuel Oil directors, realizing that something had to be done to protect the interests of the minority shareholders, approved a contract between Cities Refining and Fuel Oil which provided for price adjustments, the purpose of which was that Fuel Oil would pay no more for its refined products than if it had modernized its own plant in 1945.

The record shows that this "hypothetical refinery" arrangement produced many complications and conflicts of interest despite good faith efforts to keep them at a minimum. Thus, the Commission found that "the hypothetical refinery is not geared to meet either in quality or quantity the refined products requirements of Fuel Oil"; that there had been disputes as to the amount of compensatory discount Fuel Oil was to obtain from Cities Refining; and finally, that there had been disagreements as to the cost of certain improvements which were to be included in the cost calculations for the hypothetical refinery. The Commission found that there had also been many mathematical errors in computation and it concluded that the whole concept of working on the basis of a hypothetical refinery whose capacity and costs were fixed at the 1945 level was not only impractical, but it was detrimental to Fuel Oil, for it put that company on an operational basis where it could not take advantage of any improvements. The Commission further concluded that:

"The inherent conflict of interests which pervades all aspects of dealings between the Fuel Oil system and the Cities system is such that it constitutes a detriment to the interests of the minority stockholders, who are thereby deprived of a management conducting Fuel Oil's affairs with an eye single to its own advantage."

This brief résumé of the facts shows that there is ample support in fact and

common sense for the conclusions of the Commission that there were inherent conflicts of interest and the *de facto* disenfranchisement of the minority interest. On this record the Commission was justified in refusing to grant exemption to Cities until Fuel Oil eliminated the minority interest.

Since we find that the Commission still has jurisdiction over both Cities and Fuel and can require Fuel Oil to comply with § 11(b) (2) by eliminating the minority interest, and since there is substantial evidence to support its finding of an inequitable distribution of voting power, we affirm the decision and order of the Commission denying the application of Cities Service for exemption for itself and each of its subsidiaries from the provisions of the Public Utility Holding Company Act of 1935.